**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
**UNITED STATES OF AMERICA,**

                      **Plaintiff**

      -against-

**ANDREW ROCCO,**

                    **Defendant.**

------------------------------------------------------------ x

18-CR-00420-23 (ALC)

<u>ORDER</u>

**ANDREW L. CARTER, JR., District Judge:**

       On January 29, 2020, Defendant Andrew Rocco ("Defendant" or "Rocco") pleaded guilty to firearms trafficking in violation of 18 U.S.C. § 922(a)(1). Mr. Rocco began serving a term of supervised release on June 9, 2022. On August 16, 2022, Mr. Rocco appeared before the Court after Probation filed violation specifications alleging that Mr. Rocco failed to provide a place of residence or maintain required contact with Probation. Later that day, he left the Southern District of New York, without Probation's permission to travel to Florida, with his brother Wilfredo Rosado, a friend named Carlos Serrano, and two minor girls. The minor girls (who were referred to in the hearing as "N.M." and "L.Q.," and collectively as the "Minor Victims") are 16 and 17 years old, respectively.

       On August 18, 2022, Mr. Rocco was arrested in Tampa, Florida and was charged with unlawful interference with the custody of a minor in violation of Florida Statute 787.03. On September 29, 2022, Mr. Rocco was presented before U.S. Magistrate Judge James L. Cott and was detained.

An amended violation report was filed by Probation on October 14, 2022, which sets forth five specifications: Specifications 1 and 2 reflect Mr. Rocco's failure to notify Probation of a change of residence and to provide an updated address and contact information to Probation; Specification 3 alleges Mr. Rocco left the Southern District of New York without permission from the Court or Probation; Specification 4 alleges that Mr. Rocco committed the state crime of interference with custody of a minor in violation of Florida Statute 787.03; and Specification 5 alleges that Mr. Rocco communicated and/or interacted with someone engaged in criminal activity, in that he was identified in a vehicle with his brother, Wilfredo Rosado, a convicted felon, and a minor being sought in connection with human trafficking (L.Q.).

Defendant does not contest Specifications 1-3, and the Court holds that the record establishes Rocco's violation of these Specifications. Specification 4 was the subject of the January 4 Hearing. With respect to Specification 5, Defendant does not contest that his brother, Wilfredo Rosado, is a convicted felon or that he communicated or associated with Mr. Rosado. However, Mr. Rocco does contest that he was present when his brother, or anybody else, was committing a crime. Specifications 4 and 5 are discussed in detail below.

On October 29, 2022, this Court set the revocation hearing for December 1, 2022. The hearing was later adjourned to and held on January 4, 2023 (the "Hearing"). The Court received written submissions from the parties during and after the Hearing. Based on the parties' submissions and the evidence presented, including the Court's assessment of the witnesses' credibility, the Court finds that the Government has met its burden as to Specifications 1-5.

## BACKGROUND

**<u>The Evidence</u>**

The Court heard live testimony from Detective Ryan Daniels of the Hillsborough County, Florida, Sherriff's Office and Talia Magnani, a mentor to victims of human trafficking and sexual assault who served as a counselor to N. M. (also referred to as "Minor Victim-1"). The Court also received into evidence several exhibits, including surveillance footage, text messages, and social media posts.

Reserving decision on whether hearsay statements ultimately would be admitted into evidence, the Court permitted the Government's witnesses to testify at the Hearing, and the Court allowed the parties to make arguments in post-hearing briefing as to the admissibility of the hearsay statements.

**Testimony of Detective Ryan Daniels**

On August 17, 2022, Detective Daniels and other members of the Human Trafficking unit within the Hillsborough County Sheriff's Office (the "task force") were contacted by the Pittsfield Police Department in Massachusetts to recover two missing juveniles that were suspected to be in Hillsborough County, Florida. Tr. 12:19-23. Members of the task force later determined that the two Minor Victims had been transported to Florida from New York by the defendant and his brother Wilfredo Rosado. *Id.* at 16:20-21, 30:7-10. On August 18, 2022 at approximately 9:00 a.m., after tracking L.Q.'s cell phone, Daniels and his task force located L.Q., who was found asleep in the front passenger seat of a silver Volkswagen minivan parked in a Walmart parking lot, with Wilfredo Rosado, Mr. Rocco's brother, asleep in the back seat. *Id.* at 61-63.

Upon approaching and finding Rosado asleep in the van with L.Q., members of the task force also observed narcotics in plain view. Tr. 16:1-11. Detectives then questioned Rosado and, while he admitted to having traveled from New York with L.Q., he did not admit to traveling with Mr. Rocco or N.M. *Id.* at 16:20-17:22.

When members of the task force searched the van, they found powder cocaine within a cigarette box on the driver's side door panel. Tr. 18:4-7; 18:11-13. After a search of Rosado's person, the task force also found crack cocaine and more powder cocaine. *Id.* at 18:14-25. Rosado was subsequently arrested and charged with narcotics offenses, *id.* at 19:4-5, in addition to also being charged with interference with the custody of a minor. In a post-arrest interview, Mr. Rosado claimed ownership of the drugs. *Id.* 66:15- 22. Mr. Rosado did not make any statements regarding Mr. Rocco possessing, giving or buying the drugs, or having any knowledge of their existence. *Id.*

After they were unable to gather more information on the whereabouts of N.M. from Rosado, members of the task force questioned L.Q. in order to locate her. After about an hour of questioning, L.Q. eventually told Daniels that she thought N.M. was at a Regency Inn motel about two miles away from the Walmart, where she knew N.M. and Rocco to have spent the previous night. *Id.* at 22:3-8. The Government introduced surveillance footage showing Mr. Rocco and N.M. entering the motel around 2:30 A.M. on the morning of August 18, 2022. The two entered a private room and exited the private room together some 8 hours later, at around 10:49 A.M. Tr. 25-26, GX 1, 3, 4, 18.

L.Q. rode in the car with Daniels to the hotel, but when they arrived N.M. and Mr. Rocco were not there. L.Q. then realized she had an address of where N.M. might be and gave the address to Daniels. Tr. 67:19-68:16. Mr. Rocco, N.M., and Carlos Serrano were then found at a

private residence nearby. *Id.* at 28:4-10, GX-5. The defendant and Serrano were immediately arrested. *Id.* at 29:5-8. Members of the task force searched a black duffel bag that belonged to the defendant and found money, a condom, a hairbrush, and jewelry. *Id.* at 29:14-30:2. Mr. Rocco was *Mirandized* and did not make any post-arrest statements. *Id.* at 29:9-13. After being *Mirandized*, Serrano confirmed that he had traveled from New York to Florida with Rocco, Rosado, and the Minor Victims. *Id.* at 30:7-10. He also noted that he believed Rocco and Rosado to be in respective romantic relationships with N.M. and L.Q. *Id.* at 30:11-17. He related that, in the early morning of August 18, L.Q. and N.M. also went to a Tampa casino with Rocco, Rosado, and Serrano. GX-6, 7. Because the casino is located within a hotel, the Minor Victims did not have to provide any identification in order to enter. *Id.* at 31:23-32:6.

**Information from L.Q.'s Phone**

The Government offered text messages extracted from L.Q.'s phone pursuant to a judicially authorized search warrant. *See* GX-10. The texts established that L.Q. and N.M. had been living in Manhattan with Rocco and Rosado before their trip to Florida (GX-10 at 13) and that L.Q. described Rosado as her "boyfriend" and described Rocco as N.M.'s "boyfriend" (*Id.*). L.Q.'s cellphone search history was also extracted from the phone. In GX-22, the Government offered records showing that during the group's travel to Florida, L.Q. repeatedly searched terms such as "[N.M.] missing" and accessed news articles in which N.M.'s disappearance was publicly reported. Based on the evidence and testimony presented at the hearing, there is no evidence that Mr. Rocco saw, was made aware of, or discussed the news article regarding N.M. being missing with L.Q. Tr. 70:14-21.

5

**Videos from Wilfredo Rosado's Phone**

In addition, the Government offered videos that were extracted from Wilfredo Rosado's phone pursuant to a judicially-authorized search warrant. Those videos, both of which were recorded on August 8, 2022, corroborated other testimony about L.Q. and N.M. having lived with the defendant and Rosado for some time in New York prior to their trip to Florida. GX-16, 17. One of the videos—which appeared to have been taken by N.M., who is seen in the beginning and end of the frame—showed L.Q. and Rosado on a bed with L.Q. resting her head on Rosado's lap. GX-17.

**Information from Mr. Rocco's Phone**

The Government also offered evidence from the defendant's Instagram account, with the username "2mb.jax1." Some exhibits were extracted from his public Instagram page and others were obtained pursuant to a judicially-authorized search warrant. One of those exhibits confirmed that on the evening of August 16, 2022, the defendant and Rosado were traveling in what appeared to be the same van in which L.Q. was recovered, and with a girl who appeared to be N.M. GX- 19, Tr. 46:5-14. Other exhibits proved that Rocco was facilitating commercial sex acts at the same time that the defendant and his brother were living with the Minor Victims. *See* GX- 9A, B, C, D.

**Testimony of Talia Magnani**

Talia Magnani, a mentor for survivors of child sexual assault and human trafficking, offered testimony for the Government. Ms. Magnani works for a government funded organization that specializes in counseling and care for victims of human trafficking. Tr. 98-101.

She was contacted by members of the task force once N.M. and L.Q. were recovered. *Id.* at 103:6-9. She then conducted a private intake interview with N.M. Ms. Magnani testified that she had at least a dozen interviews with N.M., both over the phone and in person, in order to provide counseling to her since August 2022. *Id.* at 114:14-16. In the course of these conversations, N.M. repeatedly told Ms. Magnani that she and Mr. Rocco were in a sexual relationship, described him as her "boyfriend", and stated that Mr. Rocco knew her true age and custody status. *Id.* at 114:14-23.

On August 23, 2022, Magnani met privately with N.M. at the juvenile detention center where she was being held. Tr. 110:1-4. Ms. Magnani testified that at that meeting N.M. stated that she had told Mr. Rocco that she was 16. *Id.* at 111:14-19.

**N.M.'s Statements to Law Enforcement**

On August 18, and again on August 19, N.M. gave statements to law enforcement, which were recorded. Tr. 83-84. Talia Magnani was also present during the August 19 interview. In both of the recorded interviews, N.M. stated that she had told Mr. Rocco that she was 18 years old, and neither N.M. nor L.Q. said they were forced, hurt, or trafficked in any way. *Id.* at 83-85:16. N.M. was uncooperative with law enforcement immediately following her recovery. *Id.* at 58:20-24. She initially denied being in a sexual relationship with Mr. Rocco. She also claimed that she told Rocco she was 19, despite having stated otherwise earlier in a confidential conversation with Ms. Magnani. *Id.* at 106:15-108:7.

According to Ms. Magnani, in an August 18, 2022 meeting, N.M. told her that she had a sexual relationship with Mr. Rocco, that Mr. Rocco was her "boyfriend", and that Mr. Rocco knew her real age and knew that she was a missing person. *Id*. at 114:14-23. Ms. Magnani

7

remained present during N.M.'s recorded interview with law enforcement that began about an hour later, during which N.M. denied having a sexual relationship with Mr. Rocco, and where she stated that she had told Mr. Rocco she was 18 years old, and that Mr. Rocco did not know her true age. Tr. 133-134:19.

## LEGAL STANDARD

**Revocation of Supervised Release**

"A district court may revoke supervised release and impose a term of imprisonment if the court finds by a preponderance of the evidence that the defendant violated a condition of supervised release." *United States v. Peguero*, 34 F.4th 143, 152 (2d Cir. 2022); 18 U.S.C. § 3853(e)(3). The Government bears the burden to prove by a preponderance that the defendant violated a supervised release condition. "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not." *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016). "[A] district court may find that a defendant has committed another crime even in the absence of a conviction for that crime." *United States v. Glenn*, 744 F.3d 845, 848 (2d Cir. 2014).

**Admissibility of Hearsay Statements**

Because revocation hearings are "not deemed part of a criminal prosecution, ... defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (quoting *Morrissey v. Brewer*, 408 U.S. 471 (1972))." Neither the Federal Rules of Evidence nor the Sixth Amendment's Confrontation Clause apply with full force in a revocation

8

proceeding." *United States v. Diaz*, 986 F.3d 202, 209 (2d Cir. 2021). The Second Circuit explains that this is because revocation proceedings "must be 'flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.' " *Id.* (quoting *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972)).

While district courts need not comply with the Federal Rules of Evidence during supervised release revocation proceedings, their findings must be based on "verified facts" and accurate knowledge." *United States v. Bari*, 599 F.3d 176, 178-79 (2d Cir. 2010); *see also United States v. Cancer*, 797 F. App'x 8, 11 (2d Cir. 2019). Additionally, although the Confrontation Clause " 'does not apply ... Federal Rule of Criminal Procedure 32.1 provides that a defendant is entitled 'an opportunity to ... question any adverse witness unless the court determines that the interest of justice does not require the witness to appear[.]' " *Peguero*, 34 F.4th at 154 (quoting *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006) and Fed. R. Crim. P. 32.1(b)(2)(c)).

"When a proffered out-of-court statement made by an adverse witness is not within an established hearsay exception, 'Rule 32.1 requires the court to determine whether good cause exists to deny the defendant the opportunity to confront the adverse witness.' " *Diaz*, 986 F.3d at 209 (quoting *Williams*, 443 F.3d at 45.) To determine whether good cause exists to admit hearsay, "the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45.

Unavailable declarants who are minor victims of sexual assault or abuse are given special protections under the law. As the Supreme Court has held, "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at

9

least in some cases, a defendant's right to face his or her accusers in court. That a significant majority of States have enacted statutes to protect child witnesses from the trauma of giving testimony in child abuse cases attests to the widespread belief in the importance of such a public policy." *Maryland v. Craig*, 497 U.S. 836, 853 (1990).

## DISCUSSION

**Admitting Ms. Magnani's Testimony**

The Court holds that the testimony of Ms. Magnani is admissible, as her testimony was reliable, and N.M. could reasonably be presumed to be afraid or reluctant to testify against Mr. Rocco.

The Second Circuit has explained that "a witness does not need to be completely unreachable for there to be good cause for the witness not to testify at a revocation hearing." *Peguero*, 34 F.4th at 155; *see*, e.g., *United States v. Harris*, 838 F.3d 98, 107–09 (2d Cir. 2016) (holding that good cause existed to not allow confrontation when a locatable witness refused to testify out of fear of the defendant).

Ms. Magnani had at least a dozen meetings over the course of several months with N.M. in which N.M. consistently related that the defendant knew she was a minor, Tr. at 115:11-22, 117:11-13 (Q. And has N.M. also told you that she subsequently confirmed to the defendant that she was 16 years old? A. Yes, ma'am.), and that he learned she was a minor before they traveled to Florida because she told him. *Id.* at 141:10-18. Though N.M. recanted these comments in a call with Ms. Magnani on the day before the Hearing, it is likely that N.M. was merely acting out of fear or a desire to protect Mr. Rocco. *See also United States v. Carthen*, 681 F.3d 94 (2d Cir. 2012) (upholding the district court's decision to exclude a victim's recantation of prior testimony

on the eve of the hearing as unreliable and purely motivated by fear). Based on the record before the Court, the only times that N.M. refuted her incriminating statements about Mr. Rocco were on the eve of the Hearing and in conversations with law enforcement. It is likely that N.M. recanted her prior truthful statements in an attempt to protect herself and/or shield defendant from potential consequences. This is corroborated by the testimony of Det. Daniels and Ms. Magnani in the Hearing, as they noted that trafficking victims are often uncooperative with law enforcement for fear of incriminating themselves or the people they are associated with. *See e.g.,* Tr. 108- 109 (Magnani); 57-79 (Daniels).

Further, Ms. Magnani has had multiple meetings with N.M., and stated that in several of them, N.M. said she had sexual intercourse with Defendant. Considering the special protections conferred on unavailable declarants who are minor victims of sexual assault or abuse, the Court holds that good cause exists to deny the defendant the opportunity to confront N.M. in open court. *See Maryland v. Craig*, 497 U.S. 836, 853 (1990) ("[A] State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court.")

**Specification 4**

Specification 4 alleges that on or about August 18, 2022, the defendant unlawfully interfered with the custody of a minor in violation of Florida Statute 787.03. The relevant elements of that Statute are as follows:

> "Whoever, without lawful authority, knowingly or recklessly takes or entices, or aids, abets, hires, or otherwise procures another to take or entice, any minor or any incompetent person from the custody of the minor's or incompetent

11

person's parent, his or her guardian, a public agency having the lawful charge of the minor or incompetent person, or any other lawful custodian commits the offense of interference with custody and commits a felony of the third degree."

It is a defense that:

(a) The defendant had reasonable cause to believe that his or her action was necessary to preserve the minor or the incompetent person from danger to his or her welfare.

(b) The defendant was the victim of an act of domestic violence or had reasonable cause to believe that he or she was about to become the victim of an act of domestic violence as defined in s. 741.28, and the defendant had reasonable cause to believe that the action was necessary in order for the defendant to escape from, or protect himself or herself from, the domestic violence or to preserve the minor or incompetent person from exposure to the domestic violence.

(c) The minor or incompetent person was taken away at his or her own instigation without enticement and without purpose to commit a criminal offense with or against the minor or incompetent person, and the defendant establishes that it was reasonable to rely on the instigating acts of the minor or incompetent person.

Finally, "proof that a person has not attained the age of 18 years creates the presumption that the defendant knew the minor's age or acted in reckless disregard thereof." Fl. Stat. 787.03.

The evidence presented at the Hearing established by a preponderance of the evidence that the defendant committed Specification 4. Notably, at the Hearing, Mr. Rocco did not contest that he and N.M. had a sexual relationship, or that N.M. had been reported missing before the Florida trip.

As the Government proved at the Hearing, there is no dispute that N.M. is a 16-year old minor currently in foster care in Massachusetts, and therefore in the lawful custody of the state. *See* GX-15. The Government's evidence also established that Rocco, Rosado, and Serrano took N.M. and L.Q. from New York to Florida.

Despite Defense Counsel's frequent refrain that the Minor Victims were not involved in any "commercial sexual activity" during the trip, this is not what the statute prohibits. Florida Statute 787.03 does not require that the defendant facilitated commercial sexual activity with the minor victim, nor does it require any sexual contact at all. *Lindemuth v. State*, App. 3 Dist., 247 So.3d 635 (2018). The Government is only required to show that the defendant knowingly or recklessly transported a minor in interference with her lawful custody. Here, where there is plentiful evidence that Rocco transported N.M. from New York to Florida, The Court finds that the Government's burden is met.

Mr. Rocco argues in his submissions that he did not know N.M.'s true age. However, under the statute, "proof that a person has not attained the age of 18 years creates the presumption that the defendant knew the minor's age or acted in reckless disregard thereof." Fl. Stat. 787.03. Defendant did not overcome this presumption, and at the very least acted in reckless disregard for N.M.'s age.

According to Ms. Magnani's testimony, N.M. told Rocco her true age multiple times. In numerous meetings, N.M. told Magnani that Rocco knew she was a minor. *See, e.g.,* Tr. 115:11-

22, 117:11-13 (Q. And has N.M. also told you that she subsequently confirmed to the defendant that she was 16 years old? A. Yes, ma'am.). Further, N.M. confirmed that she and the defendant had a sexual relationship "almost every time [they] spoke about him." *Id.* at 114:24-115:1.

Defendant's argument that N.M. and L.Q. traveled to Florida willingly is also unavailing. Mr. Rocco asserts that he is eligible for one of the statutory defenses because N.M. and L.Q. traveled on "[their] own instigation without enticement." The Hearing evidence showed that Mr. Rocco and Mr. Rosado were traveling to Florida, and N.M. asked to join them. Tr. 135:13-18. The Minor Victims only traveled to Florida to accompany Rocco and Rosado, and no evidence presented or testimony given showed that the girls paid for food or lodging. The statute does not require that the girls had to be physically forced, threatened, or harmed, as Mr. Rocco implies in his submission. *See* ECF No. 901 at 9-10. In addition, Rocco, Rosado, N.M., and L.Q. were all living together at the time of the trip. GX 16, 17, Tr. 118:19-24. There is no evidence either Minor Victim had any job or any source of income, and therefore it is reasonable to conclude that the Minor Victims were not free to decline to travel with Rocco and Rosado. Finally, a free trip to Florida is sufficiently enticing for the Court to reject this argument.

This statutory defense also requires that Defendant establish that he traveled "without purpose to commit a criminal offense with or against the minor or incompetent person, and . . . that it was reasonable to rely on the instigating acts of the minor or incompetent person." The evidence presented at the Hearing forecloses this argument too, as Defendant's travel had numerous criminal purposes. The Defendant's brother claimed that the purpose of the trip was "to get high," and was found with crack and cocaine on his person*. Id.* at 66:15-18. The marijuana found during the search of the van emitted an odor so noticeable that the officers

ordered Rosado and L.Q. out of the car when they arrived. Tr. at 64:10-18; *see also* Florida Statute 893.13(6)(b) (marijuana possession remains a criminal offense in Florida).

Specifically regarding Mr. Rocco, under Florida law, any sex act between the defendant and N.M. is considered statutory rape. *See* Florida Statute 794.05 ("A person 24 years of age or older who engages in sexual activity with a person 16 or 17 years of age commits a felony of the second degree."). Defendant did not dispute that he and N.M. had sex when they spent the night in the motel room together. The Government introduced surveillance video of Rocco spending the night alone in a motel room with N.M., who described him as her "boyfriend." The Court infers that it is more likely than not that they engaged in sexual activity.

The evidence presented at the Hearing established by a preponderance of the evidence that the defendant either knew or acted in reckless disregard of the Minor Victims' real ages, and thus committed the offense in Specification 4.

**Specification 5**

Specification 5 alleges that Mr. Rocco communicated and/or interacted with someone engaged in criminal activity, in that he was identified in a vehicle with his brother, Wilfredo Rosado, a convicted felon, and a minor being sought in connection with human trafficking. As discussed in detail above, and as evidenced by his travels with Rosado and L.Q., the Court also finds that Rocco committed the offense in Specification 5.

## CONCLUSION

The Court adjudges Mr. Rocco to be guilty of violating Specifications 1,2,3,4, and 5. Sentencing on the violations is scheduled for **April 4, 2023 at 3:30 p.m.** The Status Conference

set for March 2 at Noon is hereby adjourned. Defendant shall submit any sentencing materials no later than **March 24, 2023**. The Government shall submit its submissions by **March 31, 2023**.

**SO ORDERED.**

**Dated:**    **New York, New York**
              **March 1, 2023**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**